IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| ELIAS CUSTODIO, | ) | |
| | ) | |
| Petitioner, | ) | Case No. CV04-589-S-EJL |
| | ) | |
| vs. | ) | **MEMORANDUM ORDER** |
| | ) | |
| GREG FISHER, Warden, I.M.S.I., | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

Pending before the Court is Respondent's Motion for Summary Judgment (Docket No. 50).  Having reviewed the Motions and Responses, and having considered the state court record, the Court finds that oral argument is unnecessary to resolve the Motion. Accordingly, the Court enters the following Order.

## MOTION FOR SUMMARY JUDGMENT

### A.    Background

After a trial by jury, Petitioner was convicted of involuntary manslaughter in the death of Patrick Kelley, voluntary manslaughter in the death of Jacob Kelley, aggravated battery in the shooting of Katherine Kelley, and burglary.  *State's Exhibit A-2*, at pp. 356-80.  Thereafter, Petitioner filed a direct appeal and a post-conviction action.  *See State's*

**MEMORANDUM ORDER - 1**

*Exhibits B-1 through D-7.*  Petitioner received some relief on a sentence enhancement claim on direct appeal, but was otherwise unsuccessful in the Idaho appellate courts.

Previously in this federal habeas corpus case, the Court dismissed Claim 6 on the merits, and it dismissed Claims 20 through 25 because they failed to state a claim or were repetitive of other claims.  The Court also dismissed Claims 2, 3, 5, 7 (as a jury instruction claim), and 8 through 19, as procedurally defaulted.

The Court allowed Petitioner to proceed on the merits of Claim 1, 4, and 7 (as an ineffective assistance of counsel claim).  Respondent asserts entitlement to summary judgment on all three remaining claims.

**B.    Standard of Law**

In order to obtain federal habeas corpus relief from a state court judgment, the petitioner must show that the state court's adjudication of the merits of his federal claim either:

> 1.  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> 2.  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In *Williams v. Taylor*, 529 U.S. 362, 385 (2000), the United States Supreme Court explained that, to prevail under § 2254(d)(1), a petitioner must show that the state court

**MEMORANDUM ORDER - 2**

was "wrong as a matter of law," in that it "applie[d] a legal rule that contradicts our prior holdings" or that it "reache[d] a different result from one of our cases despite confronting indistinguishable facts." *Ramdass v. Angelone*, 530 U.S. 156, 165-66 (2000) (citing *Williams v. Taylor*).  Or, a petitioner can prevail by showing that the state court was "[objectively] unreasonable in applying the governing legal principle to the facts of the case," or "was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled," *Ramdass v. Angelone*, 530 U.S. at 166 (citing *Williams v. Taylor*); however, a petitioner cannot prevail under the unreasonable application clause "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411.

Under AEDPA, "[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); 28 U.S.C. § 2254(e)(1).  A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340; 28 U.S.C. § 2254(d)(2).

**C.   Discussion of Claim 1: Miranda Waiver**

Petitioner's first claim is that his Fourth and Fifth Amendment rights were violated when police advised him of his *Miranda* rights when he was intoxicated, fatigued, and

**MEMORANDUM ORDER - 3**

suffering from injuries.  He further alleges that police officers took advantage of his

circumstances and read him his rights in an overly casual manner, making his waiver

invalid.  *See Amended Petition* (Docket No. 11-1).

      1.    <u>Fourth Amendment</u>

      Assuming that Petitioner's police interrogation claim can be brought under the

Fourth Amendment, the Court concludes that Petitioner has been afforded adequate

opportunity to litigate this issue in the state court system, and therefore the claim cannot

be re-litigated in federal court.  The threshold issue in a Fourth Amendment claim

presented in a federal habeas corpus petition is whether the state provided the petitioner

an opportunity for full and fair litigation of his claim in state court.  *Stone v. Powell*, 428

U.S. 465, 494 (1976).  If the federal district court determines that full and fair litigation of

the claim took place in state court, then it cannot grant habeas corpus relief on the ground

that the evidence obtained was in violation of the Fourth Amendment.  *Id*.

      Therefore, a federal district court must first "inquire into the adequacy and fairness

of available state court procedures for the adjudication of Fourth Amendment claims."

*Sanna v. Dipaolo*, 265 F.3d 1, 8-9 (1st Cir. 2001) (internal citation omitted).  If the court

determines that the state court procedures are adequate, the inquiry generally ends there.

*Id*.  That is, "[s]o long as a state prisoner has had an opportunity to litigate his Fourth

Amendment claims by means of such a set of procedures, a federal habeas court lacks the

authority, under *Stone*, to second-guess the accuracy of the state court's resolution of

those claims." *Id*. at 9.  Stated another way, "[t]he relevant inquiry is whether petitioner had the opportunity to litigate his claim, not whether he did in fact do so or even whether the claim was correctly decided." *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir. 1996).  Petitioner bears the burden of establishing that the state courts did not consider the Fourth Amendment claim fully and fairly.  *Mack v. Cupp*, 564 F.2d 898, 901 (9th Cir. 1977).

Here, the state court record demonstrates that Petitioner had a full and fair opportunity to litigate his claim.  Through counsel, he filed a motion to suppress his statement.  *State's Exhibit A-1*, pp. 70-72.  The state district court held two evidentiary hearings on the issue and issued a written memorandum decision.  *State's Exhibits A-4*, pp. 143-269 & 290-306; *Exhibit A-2*, pp. 237-245.  The issue was also fully briefed and addressed on direct appeal.  *See State's Exhibits B-3 to B-6*.  As a result, Petitioner's claim is not cognizable on federal habeas corpus review and shall be dismissed.

2.    Fifth Amendment

Prior to subjecting a suspect to custodial interrogation, law enforcement officers must inform the suspect that he has the right to remain silent, that he has the right to counsel, and that his statements can be used against him in court.  *Miranda v. Arizona*, 384 U.S. 436 (1966).  If a suspect voluntarily, knowingly, and intelligently waives his right to counsel after receiving *Miranda* warnings, law enforcement officers may question the suspect.  *North Carolina v. Butler*, 441 U.S. 369  (1979).   However, if a suspect

**MEMORANDUM ORDER - 5**

requests counsel, any interrogation must cease until the suspects consults with a lawyer or re-initiates communication with law enforcement officers. *Edwards v. Arizona*, 451 U.S.477 (1981).

Whether a *Miranda* waiver is voluntary, knowing, and intelligent is based on the totality of the circumstances. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). The court considers the defendant's age, education, and intelligence; the length of detention and the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). The absence or presence of any one factor is not determinative. *Id.*

As the Court noted in *Moran v. Burbine*, the inquiry of whether a waiver of *Miranda* is valid has "two distinct dimensions":

> First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

475 U.S. at 421 (internal citation and punctuation omitted). The state need prove the validity of a waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

The video tape of Petitioner's police interrogation provided by the State to Petitioner and the Court appears to be an incomplete version. *See State's Exhibit 10*,

**MEMORANDUM ORDER - 6**

video; *Petitioner's Final Supplemental Response*, at p. 30 (Docket No. 66); *see State's Exhibit A-4*, at p. 217.  During the suppression hearing, there was some discussion that the *Miranda* warning and signing of the waiver shown at the beginning of the original videotape had not been included on some of the copies of the video tape. The state district court appears to have viewed the original version of the video tape, including the *Miranda* waiver signing.  *See State's Exhibit A-4*, pp. 252-255.  It is unclear which version the Idaho Court of Appeals reviewed; however, that court relied on the findings of the state district court. *State's Exhibit B-5*, at p. 4.

Because the videotaped version of the *Miranda* warning and waiver signing is not available to this Court, the Court shall use the undisputed facts, Petitioner's description of the incident, and testimony consistent with Petitioner's description given at the suppression hearing, as the basis for its review of the reasonableness of the Idaho Court of Appeals' decision.[1]

It is undisputed that the *Miranda* waiver form was given to Petitioner prior to Detective Anderson and Smith's interrogation of Petitioner.  It is undisputed that Detective Anderson read the *Miranda* waiver form containing his constitutional rights to Petitioner.  It is undisputed that Anderson told Petitioner that he would answer any

---

[1]  Where evidence has been lost or destroyed after trial, there is no *Youngblood* violation. *Ferguson v. Roper*, 400 F.3d 635 (8th Cir. 2005) (referring to *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) (absent a showing of bad faith on the part of the police or prosecutor, the failure to preserve even potentially useful evidence does not constitute a denial of due process).

**MEMORANDUM ORDER - 7**

questions about Petitioner's rights.   It is also undisputed that Petitioner signed the waiver. *State's Exhibit A-4*, at pp. 189-91.

Petitioner alleges that, after he returned from the hospital, he was asleep in the interrogation room for approximately 20 minutes.  When the detectives entered the room, he asked them if he could splash water on his face.  He alleges that detectives said, "just sign right here real quick." *Petitioner's Final Supplemental Response*, at p. 30 (Docket No. 66).  This sequence of events essentially matches Detective Smith's description of the incident, with the *Miranda* warning occurring just before Detective Anderson prompted Petitioner to sign the waiver form. *See State's Exhibit A-10*,  pp. 236-37.

Plaintiff alleges that "groggily wanting water Custodio just scratche[d] an illegible line, not his signature, not totally coherent nor understanding it to be rights of *Miranda* [and a] lawyer. . . ." *Petitioner's Final Supplemental Response*, at p. 30 (Docket No. 66).

On appeal, the Idaho Court of Appeals rejected Petitioner's argument on the following grounds:

> This Court has previously recognized that intoxication is one circumstance which must be considered in evaluating whether under the totality of the circumstances a defendant's waiver was valid.  However, evidence of intoxication does not automatically signify that a waiver is invalid.   In this case, the evidence submitted at the evidentiary hearing regarding Custodio's intoxication was in conflict. However, after reviewing the videotape of the interview and listening to the testimony presented at the evidentiary hearing, the district court concluded that Custodio was not under the influence of alcohol to an extent which impaired his ability to execute a valid waiver of his *Miranda* rights.

**MEMORANDUM ORDER - 8**

A review of the videotape of Custodio's interview with police shows Custodio to be fully responsive to the questions propounded to him. Custodio's answers were coherent and understandable. At one point during the interview, Custodio snatches a flying insect out of the air, a task requiring a substantial amount of motor coordination. Although Custodio's treating physician at the hospital deemed him to be "very intoxicated," this physician also testified that Custodio appeared alert and oriented while he was being treated. Thus, the record supports the district court's finding.

Custodio next claims that his fatigue precluded him from entering a knowing and intelligent waiver of his *Miranda* rights. In its order denying Custodio's motion to suppress, the district court acknowledged that Custodio appeared tired during the interview, but determined that this fatigue did not render Custodio incapable of validly waiving his *Miranda* rights. The videotape shows that Custodio responded effectively to the questions posed by the officers. When asked to spell his surname, Custodio did so quickly and correctly. At one point, Custodio even joked with the officers indicating his desire for a cot. Based on this evidence, we conclude that there was substantial and competent evidence to support the district court's finding regarding this factor.

Custodio also asserts that his waiver was involuntary in light of the pain that he was experiencing at the time that he executed the waiver. The videotape reveals that Custodio never indicated to the police any physical discomfort other than general fatigue. In addition, Custodio's treating physician at the hospital described Custodio's injuries as "superficial abrasions and cuts." Thus, we conclude that Custodio's assertion that he was in pain to such an extent that it interfered with his ability to waive his *Miranda* rights is without merit.

Finally, Custodio asserts that the waiver was invalid because of the cursory manner in which he was read his *Miranda* rights and presented with the waiver form. Although the district court found that the officer took a casual approach in presenting Custodio with the *Miranda* waiver, the district court nonetheless determined that the officer had appropriately read Custodio his rights and informed him that if he did not understand any of these rights that they would be explained further to him. Our review of the record supports the district court's findings.

*State's Exhibit B-6*, pp. 3-4 (citations omitted).


**MEMORANDUM ORDER - 9**

a.      *Whether the Waiver was Voluntary*

A waiver of *Miranda* rights is voluntary when it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. at 421.  This Court has reviewed the video tape of Petitioner's interview with police that occurred just after the waiver was signed.  It does not appear that Petitioner's conditions of intoxication, fatigue, and injury were enough to overcome his free will and render his confession involuntary.  *See Medeiros v. Shimoda*, 889 F.2d 819, 823 (9th Cir. 1989) (Medeiros was intoxicated but not incapacitated because he was able to drive a car, obey the officers' orders, and cooperate in conversing with them).  Rather, the Court agrees that Petitioner's responses to the officers' questions were quick, clear, and appropriate, and his physical dexterity was clearly intact.  These facts show that he had the capacity to act according to his free will.

Petitioner was obviously still somewhat emotionally shocked from the altercation; however, he knew that he had shot two people, and he entered the police station with the intent to "do the right thing under the circumstance, and a law abiding citizen [sic].  He turned himself in . . . ."  *Petitioner's Final Supplemental Response*, at p. 7 (Docket No. 66).  Prior to signing the *Miranda* waiver, Petitioner had told his uncle, Sam Custodio, that he had "shot two guys," and had told the emergency room doctor that he had "wasted two guys."  *See State's Exhibit A-9, Supplemental Police Report of Detective Anderson*, pp. 1-6; *see State's Exhibit A-4* (Transcript of Suppression Hearing), pp.171-72.

**MEMORANDUM ORDER - 10**

In other words, when he signed the waiver, Petitioner had no reason to believe he was not a "suspect," and he knew he was certainly not a bystander-type witness. The Court is unpersuaded by Petitioner's argument that the detectives should have determined and told him whether the two people he had shot had actually been killed or were merely wounded prior to presenting him with the *Miranda* waiver.[2] Petitioner does not show how or why his decision to sign the waiver would have been different had he known that he was going to be charged with murder rather than attempted murder or some lesser charge.

Rather, from the instant he came to the police station to turn himself in, his intent was to cooperate. His desire to "do the right thing," and his hope that the two people he shot had not been killed or that he would be immediately exonerated on self-defense grounds do not make his waiver involuntary. "Indeed, the Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" *Colorado v. Connelly*, 479 U.S. at 170 (*quoting Oregon v. Elstad*, 470 U.S. 298, 305 (1985)). Rather, "[t]he sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion," not on Petitioner's hopes of what the legal consequences of his actions may be. *See id.*, 479 U.S. at 170.

---

[2] In addition, Petitioner had shot and wounded the hand of a third person, the dead victims' mother.

**MEMORANDUM ORDER - 11**

A related allegation is that Detective Anderson affirmatively deceived him by failing to tell him that at least one of the victims had died.  This allegation does not show coercion; rather, coercion is shown in factors such as "the duration and conditions of detention (if the confessor has been detained), the manifest attitude of the police toward him, his physical and mental state, [or] the diverse pressures which sap or sustain his powers of resistance and self-control." *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961).  In *Colorado v. Spring*, 479 U.S. 564 (1987), the Court reasoned:

> Once *Miranda* warnings are given, it is difficult to see how official silence could cause a suspect to misunderstand the nature of his constitutional right -- "his right to refuse to answer any question which might incriminate him." *United States v. Washington*, 431 U.S. 181, 188, 97 S.Ct. 1814, 1819, 52 L.Ed.2d 238 (1977).  "Indeed, it seems self-evident that one who is told he is free to refuse to answer questions is in a curious posture to later complain that his answers were compelled." *Ibid*. We have held that a valid waiver does not require that an individual be informed of all information "useful" in making his decision or all information that "might . . . affec[t] his decision to confess." *Moran v. Burbine*, 475 U.S., at 422, 106 S.Ct., at 1141.  "[W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." *Ibid*. Here, the additional information could affect only the wisdom of a *Miranda waiver*, not its essentially voluntary and knowing nature.  Accordingly, the failure of the law enforcement officials to inform Spring of the subject matter of the interrogation could not affect Spring's decision to waive his Fifth Amendment privilege in a constitutionally significant manner.

*Id*. at 576-77.

Petitioner also argues that because he had taken a short nap just prior to signing the waiver, it was involuntary.  When he was awakened, Petitioner requested that he be allowed to splash water on his face.  Detective Anderson quickly read him his rights,

**MEMORANDUM ORDER - 12**

informed him they would answer any questions about his rights, and told him to sign the waiver before he went into the bathroom.  He signed and then went into the bathroom. After Petitioner had finished splashing water on his face, there is no indication that he had forgotten that he signed a waiver or had any question as to its contents.  Rather, he appeared entirely capable of hearing, understanding, and responding to questions.  The Court rejects the argument that his 20-minute nap rendered him incapable of hearing, understanding, and signing the waiver.  *See U.S. v. Brown*, 2004 WL 1529279, at *3 (D. Me. May 12, 2004), *report and recommendation adopted by* 2004 WL 1571895 (D. Me. June 22, 2004) ("With respect to the defendant's other arguments, he offers no citation to authority to support his contention that some unspecified yet critical period must pass after an individual is awakened from sleep before his waiver of *Miranda* rights and inculpatory statements may be considered voluntary as a matter of law.").

Neither can requesting him to sign the waiver directly after his nap be deemed coercive.  *Cf. United States v. Turner*, 926 F.2d 883, 888 (9th Cir.1991) ("Merely awakening a suspect to arrest him is not coercive conduct"; statements are not involuntary solely because made when defendant had just been awakened.).  Petitioner had in mind the goal of telling his side of the story prior to coming to the police station, and he fulfilled his goal after signing the waiver.  The intervening nap did not obstruct his goal, which is evidence that his will was not overcome by the manner and timing of officers' presentation of the waiver to him.

**MEMORANDUM ORDER - 13**

This Court agrees that Detective Anderson's delivery of the *Miranda* warning was less than ideal, but the record shows that Petitioner knew that he had shot two people, but wished to voluntarily speak to the law enforcement officers about his role in the incident because he thought it was the right thing to do.  Detective Anderson's minimization of the significance of the waiver was not accompanied by any threat or promise.  *Cf. U.S. v. Tucker*, 2006 WL 1207972 (D. Ohio 2006) (finding that waiver was improperly coaxed or cajoled when the officer told defendant he had heard his rights in the past, that it really was not necessary to go through a recitation of those rights again, and that he should just sign the waiver so they could "figure out what's going on here," which the court interpreted as an offer to give the defendant something of value if he signed the waiver).  Even if Detective Anderson's statement to Petitioner that he did not know if the victims had died was deceptive, there is no evidence in the record that Petitioner's will was "*the product of* . . . intimidation, coercion, or deception," rather than his voluntary desire to tell his side of the story to police.  *See Moran v. Burbine*, 475 U.S. at 421 (emphasis added).

   b.  *Whether Miranda Waiver was Knowing and Intelligent*

  A waiver of one's *Miranda* rights "must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."  *Moran v. Burbine*, 475 U.S. at 421.  A reviewing court must find that the defendant had a "requisite level of comprehension" from the "totality of the

**MEMORANDUM ORDER - 14**

circumstances" in order to properly conclude that his *Miranda* rights have been waived. *Id.*

The Idaho Court of Appeals concluded that its own review of the state court record supported the state district court's findings. *State's Exhibit B-6*, p. 4. Considering the factors set forth by the United States Supreme Court, this Court agrees that the state court record supports the district court's factual findings for the following reasons.

The *Miranda* waiver form was given to Petitioner prior to police interrogation. Detective Anderson read the *Miranda* waiver form containing his constitutional rights to Petitioner. Anderson told Petitioner that he would answer any questions about Petitioner's rights. Petitioner signed the waiver. *State's Exhibit A-4*, at pp. 189-91. When detectives began questioning Petitioner after he had refreshed himself by splashing water on his face, he did not ask about what he had just signed or ask any questions about his rights. He showed no sign of being unable to understand any of the detectives' questions. This lends credibility to the determination that he knew and understood his *Miranda* rights and intended to execute the waiver given to him immediately preceding the questioning.

Defendant was 26 years old at the time of the incident. He had a G.E.D., worked in sales, and had just obtained a new job as a car salesman. Petitioner had substantial past experiences with police officers and the criminal justice system, having been convicted of one prior felony and having had multiple arrests and criminal charges. State'*s Exhibit A-9*

**MEMORANDUM ORDER - 15**

(Presentence Investigation Report); *see U.S. v. Garibay*, 143 F.3d 534, 537-39 (9th Cir.

1998) (whether the defendant signed a written waiver, whether he was advised in a

language he could understand, whether he appeared to understand his rights, whether his

rights were read to him as an individual, and whether he had prior experience with the

criminal justice system are factors to consider in the totality of circumstances analysis).

Petitioner's *Miranda* warning occurred at approximately 1400 hours.  He was

questioned, with several breaks, until approximately 1510 hours, when he invoked his

right to counsel.  Therefore, the questioning lasted only a little over an hour.  While he

appeared tired,  he was not intentionally deprived of sleep by officers nor was the

questioning over a long period of time.  Petitioner did not request food.  He requested a

cigarette, which he was given.  And, as the Court of Appeals found significant, he

snatched a fly out of the air during one of the breaks, which is inconsistent with his

assertions that he was too intoxicated and tired to understand what he had signed.  *See*

*State's Exhibit A-9*, *Supplemental Police Report of Detective Anderson*, pp. 1-6, & *State's*

*Exhibit A-10*, video.

The Court also concludes that the fact that the waver was in *writing* and *signed* by

Petitioner is significant.  The added formality of signing a document for police officers

makes it nearly impossible for Petitioner to argue that the warning was not given or that

he attached no significance to the event.  In *North Carolina v. Butler*, 441 U.S. 369

(1979), the Court noted that "[a]n express written or oral statement of waiver of the right

**MEMORANDUM ORDER - 16**

to remain silent or of the right to counsel is usually strong proof of the validity of the waiver," although not sufficient to establish waiver by itself. *Id*. at 373. In addition, Petitioner's extensive experience with arrests, police officers, and the court system cuts against Petitioner's allegations that he did not understand the significance of signing a formal *Miranda* waiver, albeit that the presentation of the document to him was in a quick and informal manner.

During the end of the interview, Petitioner indicated that his car was at his uncle's house, and that officers could search it only if they moved it to a different location so as not to bother his uncle's family. Petitioner spoke to his uncle by telephone about the car. Petitioner also spoke to his uncle about a lawyer. After the telephone conversation, Petitioner invoked his right to a lawyer. *See State's Exhibit A-9, Supplemental Police Report of Detective Anderson*, p. 6 & *State's Exhibit A-10*, video. There is no evidence in the record to suggest that, prior to his telephone call with his uncle, Petitioner did not know he could ask for a lawyer. Rather, the totality of circumstances, including his stated goal to tell his side of the story, suggests that he simply chose not to invoke his right to a lawyer sooner, hoping that his cooperation would merit some amount of leniency. That his hopes were not fulfilled does not render his waiver unknowing or unintelligent.

This Court must presume that the state court's findings of fact are correct unless Petitioner shows otherwise by clear and convincing evidence. Here, the state district court determined that Detective Anderson "appropriately informed Custodio that if he did

**MEMORANDUM ORDER - 17**

not understand any of rights that he would explain further." *State's Exhibit A-2*, p. 244. The court also determined that Anderson "read Custodio his *Miranda* rights from a written form." *Id*. This conduct satisfies the elements required by *Miranda*. The state district court found that "Custodio's signature on the printed *Miranda* form represented his understanding of his rights and his willingness to answer the detectives' questions." The state district court made these findings despite the fact that Detective Anderson was "extremely casual" in the manner in which he gave the *Miranda* warnings, and that Anderson attempted to minimize the significance of the waiver. These findings of fact, based upon the state court record, meet the concerns set forth in *North Carolina v. Butler*, where the Court observed that the question of waiver must be determined on "the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *Id*. at 375. The Idaho Court of Appeals concluded that its own review of the state court record supported the state district court's findings. *State's Exhibit B-6*, p. 4.

A petitioner cannot prevail under the unreasonable application clause of § 2254 "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411. Under the totality of circumstances, the state district court's factual findings and the state appellate court's adoption of those findings were not unreasonable. Given the extent of Petitioner's ability to understand the officers'

**MEMORANDUM ORDER - 18**

questions and the clarity of Petitioner's responses, the Court finds that the state appellate court was not unreasonable in determining that, in addition to being voluntary, Petitioner's waiver was knowing and intelligent.

       3.    Conclusion of *Miranda* discussion

Based on the foregoing, the Court concludes that Petitioner has not established that the Idaho Court of Appeals' decision was either contrary to or based on an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts.[3]  Respondent is entitled to summary judgment on this claim.

## D.      Discussion of Claim 4: Change of Venue

Claim 4 is that Petitioner's Fourteenth Amendment due process rights were violated when the district court denied his request for a change of venue, due to the

---

[3]  The Court notes that Petitioner has spent a substantial amount of briefing on the issue of whether he should have been given a *Miranda* warning before he was handcuffed and taken to the hospital for treatment and before conversations between him and medical personnel were audio-taped, and whether the doctor-patient privilege was violated.  He does not argue that he was interrogated by officers, but argues that they wrongfully audio-taped his unsolicited statements to officers and medical providers.  He also argues that he asked the officer who accompanied him to the hospital, "What about the court system?" and "Did somebody die?," and newly argues that these questions amount to a request for counsel.  These claims arose from Petitioner's earlier contact with a different officer, Officer Parrish, prior to any police questioning, and prior to any *Miranda* warning; therefore, they are not relevant to the question of voluntariness after Petitioner was given the *Miranda* warnings and signed the waiver form. These claims and issues have not been exhausted or are procedurally defaulted and are not properly before the Court; therefore, the Court cannot address them.

**MEMORANDUM ORDER - 19**

allegedly prejudicial effect of the news coverage, making it unlikely that he received a

fair trial.  *Amended Petition*, p. 3 (Docket No. 11-1).  In *Murphy v. Florida*, 421 U.S. 794,

798 (1975), the court held that a change of venue is required only when the defendant

shows that the pretrial publicity has been so extreme as to cause actual prejudice or that

the media coverage had "utterly corrupted" the trial.

In *Irvin v. Dowd*, 366 U.S. 717, 721 (1961), the Court explained the standard for

determining juror bias as follows:

> It is not required  . . .  that the jurors be totally ignorant of the facts
> and issues involved.  In these days of swift, widespread and diverse
> methods of communication, an important case can be expected to arouse the
> interest of the public in the vicinity, and scarcely any of those best qualified
> to serve as jurors will not have formed some impression or opinion as to the
> merits of the case.  This is particularly true in criminal cases.  To hold that
> the mere existence of any preconceived notion as to the guilt or innocence
> of an accused, without more, is sufficient to rebut the presumption of a
> prospective juror's impartiality would be to establish an impossible
> standard.  It is sufficient if the juror can lay aside his impression or opinion
> and render a verdict based on the evidence presented in court.
>
> The adoption of such a rule, however, cannot foreclose inquiry as to
> whether, in a given case, the application of that rule works a deprivation of
> the prisoner's life or liberty without due process of law.  As stated in
> *Reynolds*, the test is whether the nature and strength of the opinion formed
> are such as in law necessarily . . . raise the presumption of partiality.  The
> question thus presented is one of mixed law and fact . . . .  The affirmative
> of the issue is upon the challenger.  Unless he shows the actual existence of
> such an opinion in the mind of the jury as will raise the presumption of
> partiality, the juror need not necessarily be set aside. . . .  If a positive and
> decided opinion had been formed, he would have been incompetent even
> though it had not been expressed.
>                                        *   *   *
> The rule was established in *Reynolds* that the finding of the trial
> court upon that issue (the force of a prospective juror's opinion) ought not
> be set aside by a reviewing court, unless the error is manifest.  In later

**MEMORANDUM ORDER - 20**

cases, this Court revisited *Reynolds*, citing it in each instance for the proposition that findings of impartiality should be set aside only where prejudice is manifest.

> Impartiality is not a technical conception.  It is a state of mind.  For the . . . ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula.

366 U.S. at 724-25 (internal quotation marks and internal citations omitted).   In *Irvin*, the Court concluded that the jury was not impartial, as eight of the twelve jurors had formed an opinion that the defendant was guilty before the trial began, and some of those had said that it would take evidence to overcome their belief in his guilt.  366 U.S. at 728.

In *Dobbert v. Florida*, 432 U.S. 282 (1977), a case in which a father was charged with murdering two of his children and torturing and abusing his two remaining children, the Court further explained the standard as follows:

> Under *Murphy*, extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair. Petitioner in this case has simply shown that the community was made well aware of the charges against him and asks us on that basis to presume unfairness of constitutional magnitude at his trial. This we will not do in the absence of a "trial atmosphere . . . utterly corrupted by press coverage,"  *Murphy v. Florida, supra*, 421 U.S., at 798, 95 S.Ct., at 2035.

*Id.* at 303.

In *Murphy*, the Court made it clear that its prior precedent[4] could not be read to stand for the proposition that "juror exposure to information about a state defendant's

---

[4]*Rideau v. Louisiana*, 373 U.S. 723 (1963), *Estes v. Texas*, 381 U.S. 532 (1965), and *Sheppard v. Maxwell*, 384 U.S. 333 (1966).

**MEMORANDUM ORDER - 21**

prior convictions or to news accounts of the crime with which he is charged alone

presumptively deprives the defendant of due process."   421 U.S. at 799.  Rather, the

Court noted that resolution of a case required a reviewing court to determine whether

there were "any indications in the totality of circumstances that petitioner's trial was not

fundamentally fair."  *Id.*

For example, in *Murphy*, the Court indicated that it may be appropriate for a

reviewing court to compare the number of venire persons who admitted prejudice to the

total number of venire persons to determine whether the opinions of those persons

indicating that they were not biased should be trusted:

> The length to which the trial court must go in order to select jurors
> who appear to be impartial is another factor relevant in evaluating those
> jurors' assurances of impartiality.  In a community where most veniremen
> will admit to a disqualifying prejudice, the reliability of the others'
> protestations may be drawn into question; for it is then more probable that
> they are part of a community deeply hostile to the accused, and more likely
> that they may unwittingly have been influenced by it.  In *Irvin v. Dowd*, for
> example, the Court noted that 90% of those examined on the point were
> inclined to believe in the accused's guilt, and the court had excused for this
> cause 268 of the 430 veniremen.  In the present case, by contrast, 20 of the
> 78 persons questioned were excused because they indicated an opinion as to
> petitioner's guilt.  This may indeed be 20 more than would occur in the trial
> of a totally obscure person, but it by no means suggests a community with
> sentiment so pointed against petitioner as to impeach the indifference of
> jurors who displayed no animus of their own.

 421 U.S. at 802-03.  Comparing the number of jurors dismissed on grounds of bias

resulting from media coverage to the total number of jurors questioned in these

precedential cases and in Petitioner's case, the Court finds that the percentage of jurors

dismissed on grounds of bias against the defendant resulting from media coverage was 62% in *Irvin v. Dowd* (268 of 430), 26% in *Murphy v. Florida* (20 of 78), and only 5% in Petitioner's case (2 of 40).

On direct appeal, the Idaho Court of Appeals noted that the venue issue turns on "whether, in a totality of existing circumstances, juror exposure to pretrial publicity resulted in a trial that was not fundamentally fair," as stated in *Murphy State's Exhibit B-6*, at p. 5.  The court listed the following factors relevant to a determination of whether the defendant received a fair trial:

> evidence of a prejudice in the community, testimony at voir dire as to whether any juror had formed an opinion of the defendant's guilt, whether the defendant challenged for cause any of the jurors finally selected, the nature and content of the pretrial publicity, the length of time elapsed between the pretrial publicity and the trial, and any assurance given by the jurors concerning their impartiality.

*State's Exhibit B-6,* p. 5.  Based upon these factors, the Idaho Court of Appeals reviewed the circumstances of Petitioner's case:

> In conjunction with the motion, Custodio submitted a number of newspaper articles containing reports of the crime and pictures of the individuals involved.  However, Custodio submitted no affidavits demonstrating community prejudice arising from the media coverage.  The district court questioned the potential jurors at length during voir dire regarding the effect of pretrial publicity.  Only twelve of the initial forty potential jurors stated that they had prior knowledge of Custodio or of the crime by way of the media.  Of the twelve potential jurors who admitted to having heard of the case through the media, all but three of these jurors stated that this information would have no impact on their ability to serve as an impartial juror in this case.  The three jurors who were unwilling or unable to remain impartial due to the pretrial publicity were excused for cause.  We note that one of the three jurors excused for cause was excused

**MEMORANDUM ORDER - 23**

due to bias in favor of the defense.  Furthermore, over seven months had
passed between the date of the offense and the beginning of Custodio's
trial.  In addition, neither the prosecution nor the defense expressed any
dissatisfaction with the twelve jurors eventually impaneled.

*State's Exhibit B-6*, pp. 5-6.

The particular crime at issue in this case was a notable one, given that two young

men who were brothers, were killed, and their mother was wounded.  The nature and

content of the newspaper articles was factual, but some had a sympathetic tone toward the

victims and their family.  *See State's Exhibit B-1*.  Nevertheless, the state trial court used

the voir dire process effectively to weed out those individuals who were biased either in

favor of or against Petitioner.  Because the court excused them for cause, Petitioner's

counsel was able to excuse any others thought to harbor unstated biases on peremptory

challenges.  Petitioner made no mention of bias at trial regarding the remaining twelve

jurors who heard the case.  Neither has Petitioner shown that there was a general

prejudice against him in the community.  Finally, seven months elapsed between the

crime and the trial.

In his Response, Petitioner states that, after the trial concluded, Juror Jutila sent

him a newspaper article that painted the victims as neighborhood troublemakers, which

was printed after Petitioner was convicted.  *See Petitioner's Brief, Exhibit B* ( Docket

#33-3).  This action does not show that Juror Jutila was biased against him at the time of

the jury trial, and tends only to show that she perhaps had some sympathy for him after

the trial.

**MEMORANDUM ORDER - 24**

Petitioner also alleges that Jurors Zagorski, Obenchain, and Welch had admitted to knowing the case from television and newspaper reports.  Juror Jutila also admitted to the same.  These four jurors were ultimately selected for the jury.  However, during voir dire, Juror Zagorski said that nothing he had previously seen or heard in the media would have any impact on his ability to sit as an impartial juror in the case, and that he could easily disregard anything other than what he heard in court.  *State's Exhibit A-5*, pp. 411-12.  Juror Obenchain said he had seen and heard media accounts of the events, but could disregard them and be an impartial juror.  *Id.*, pp. 437-38.  Juror Welch said she had seen and heard information about the case, and that she could disregard them and be impartial.  *Id.*, pp. 424-25.  Juror Jutila said she could disregard anything she had seen or read about the case and had not formed any opinions about the case.  *Id.*, pp. 414-15.  Clearly, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."  *Irvin v. Dowd*, 366 U.S. at 724.

Petitioner argues that Juror Hatch was dismissed for cause.  Hatch stated that because he had been involved in interracial riots in the past, he did not think he could be impartial.  His answer had nothing to do with media accounts of the incident.  *See id.*, pp. 745-46.  Juror Boren was dismissed for cause for having read or seen media coverage on the case and believing it would impact him.  *Id.*, pp. 419-20.  Juror Sipe stated she had a private emotional reason with television and newspaper coverage, and felt she could not

**MEMORANDUM ORDER - 25**

be impartial.  *Id*., pp. 421-22.  These three responses do not show that a widespread bias against Petitioner existed in the community.

In summary, twelve of the forty jurors questioned and four of the twelve members of the actual jury had seen or heard news reports related to the incident prior to jury duty. Each of those jurors was carefully questioned by the trial court as to whether they could disregard the news reports and decide the case on what was presented in the courtroom, and whether they felt they were not impartial as a result of the news reports.  None of the jurors expressed answers that would cause the Court to question their sincerity.  In addition, counsel did not use their peremptory strikes to remove these people from the jury, and no objections were raised related to these jurors.

As noted above, only 5% of the questioned jury pool expressed an inability to remain partial, and were excused, with the court noting aloud to Juror Boren that it was looking for honest responses, and that he did not need to apologize for expressing a bias. *Id.*, p. 420.  This fact shows that the court created an environment wherein it would be easier for jurors to express themselves honestly without fear of embarrassment or reprisal.

Because Petitioner has brought forward no evidence showing that there was a widespread bias against him in the community, that any juror was impartial, and that any impartiality was due to media coverage, the Court concludes that his venue claim is based upon mere speculation.  *See Casey v. Moore*, 386 F.3d 896 (9th Cir. 2004) (prejudicial pretrial publicity did not require a change of venue unless it was impossible to seat an

**MEMORANDUM ORDER - 26**

impartial jury).  He has not shown that the news reports were so extreme as to cause actual prejudice or that they "utterly corrupted" the trial.  *See Murphy v. Florida*, 421 U.S. at 798.  As a result, he has failed to show that the Court of Appeals' decision was contrary to or an unreasonable application of clearly established federal law, or that it was based upon an unreasonable factual determination

**E.      Discussion of Claim 7: Ineffective Assistance of Counsel**

Petitioner's seventh claim is that appellate counsel failed to challenge allegedly inadequate jury instructions on appeal.  Particularly, he contends that the jury instructions did not adequately convey that the State bore the burden of proving that Petitioner did not act in self-defense on the manslaughter and aggravated battery counts for which he was convicted.  *See Amended Petition*, p. 3 (Docket 11-1).

A criminal defendant has a constitutional right to the assistance of counsel under the Sixth Amendment, made applicable to the states by the Fourteenth Amendment. *Gideon v. Wainwright*, 372 U.S. 335 (1963).  In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court established the proper test to be applied to claims alleging constitutionally inadequate representation.  To succeed on such a claim, a petitioner must show that (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness and that (2) the petitioner was prejudiced thereby. *Id*. at 684.  Prejudice under these circumstances means that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been

**MEMORANDUM ORDER - 27**

different.  *Id*. at 684, 694.  A reasonable probability is one sufficient to undermine

confidence in the outcome.  *Id*. at 694.

In assessing whether trial counsel's representation fell below an objective standard

of competence under *Strickland*'s first prong, a reviewing court must view counsel's

conduct at the time that the challenged act or omission occurred, making an effort to

eliminate the distorting lens of hindsight.  *Id*. at 689.  The court must indulge in the strong

presumption that counsel's conduct fell within the wide range of reasonable professional

assistance.  *Id.*  The pertinent inquiry "is not what defense counsel could have pursued,

but rather whether the choices made by defense counsel were reasonable."  *Siripongs v.

Calderon*, 133 F.3d 732, 736 (9th Cir. 1998).

A petitioner must establish both incompetence and prejudice to prove an

ineffective assistance of counsel case.  466 U.S. at 697.  On habeas review, the court may

consider either prong of the *Strickland* test first, or it may address both prongs, even if

one is deficient and will compel denial.  *Id.*

The *Strickland*  principles also apply to determining ineffective assistance of

appellate counsel claims.   To show prejudice on appeal, a petitioner must show that his

attorney failed to raise an issue obvious from the trial record that probably would have

resulted in reversal.  *See Miller v. Keeney*, 882 F.2d 1428, 1434 n.9 (9th Cir. 1989).  If a

petitioner does not show that an attorney's act or omission would have resulted in

reversal, then he cannot satisfy either prong of *Strickland*: appellate counsel was not

**MEMORANDUM ORDER - 28**

ineffective for failing to raise such an issue, and petitioner suffered no prejudice as a result of it not having been raised.  *See Miller*, 882 F.2d at 1435.

"Effective legal assistance" does not mean that appellate counsel must appeal every question of law or every nonfrivolous issue requested by a criminal defendant. *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983).  "[N]othing in the Constitution" requires "judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable claim' suggested by a client." *Id*., 463 U.S. at 754.

It is well established that a jury instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record.  *Cupp v. Naughten*, 414 U.S. 141, 147 (1973).  In reviewing an ambiguous instruction, the Court inquires "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution.  *Boyde v. California*, 494 U.S. 370, 380 (1990).  If a *Boyde* error is evident, the Court then must apply the harmless error analysis.  *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993).

Here, Plaintiff contends that the instructions did not adequately convey that the State bore the burden of disproving his claim of self-defense.  However, Jury Instruction No. 40 stated, in pertinent part:

> A homicide or an aggravated battery is justifiable if the defendant was acting in self-defense.. . .  The burden is on the prosecution to prove

**MEMORANDUM ORDER - 29**

beyond a reasonable doubt that defendant's conduct was not justifiable.  If there is a reasonable doubt whether the defendant's conduct was justifiable, you must find the defendant not guilty.

*State's Exhibit B-2.*

On appeal, the Idaho Court of Appeals stated the correct legal standards for ineffective assistance of counsel and inadequate jury instructions.  In rejecting Petitioner's claim, it determined:

Custodio claims the inconsistency of telling the jury that it must find him guilty if the elements of the charge are proven, and thereafter telling the jury it must find him not guilty if his conduct was justifiable was error.  He further asserts that the lack of the "without justification" language in the elements instruction confused the jury as to which offenses are subject to a defense of self-defense.

We are unpersuaded.  Taken together, the instructions given by the district court to the jury clearly reflected that self-defense was an affirmative defense to the charges with which Custodio was found guilty, in spite of lack of the "without justification" language previously used in other instructions.  Additionally, the instructions adequately informed the jury that the State bore the burden of proving, beyond a reasonable doubt, that Custodio did not act in self-defense.  We conclude that, when read as a whole, the jury instructions in this case fairly and accurately represented the law and were not so confusing as to have misled the jury.  Furthermore, Custodio repeated emphasized his self-defense theory to the jury during opening and closing arguments.  We therefore hold that Custodio has failed to demonstrate that appellate counsel's performance was deficient for not challenging, on direct appeal, the jury instructions regarding manslaughter, aggravated battery, self-defense, and the state's burden of proof.

*State's Exhibit D-5*, p. 9

The law requires that the jury instructions be considered as a whole to determine whether they were misleading or inadequate.  Here, the instructions are clear that the State bore the burden of proof to show (1) existence of the elements of the crime and (2)

**MEMORANDUM ORDER - 30**

that Petitioner did not act in self-defense.  The instructions clearly stated that the standard of proof for each charged crime was "beyond a reasonable doubt."  *State's Exhibit A-6*, pp. 3008-29.  Jury Instruction No. 40 referenced a "homicide or aggravated battery," so that the jury was aware that if they found the elements of the crime, then they were to proceed to determine whether the prosecution proved beyond a reasonable doubt that defendant's conduct was *not* justifiable.  Finally, the instruction required the jury to find the defendant not guilty if the conduct was justifiable.  *Cf. U.S. v. Pierre*, 254 F.3d 872, 876 (9th Cir. 2001) (instructions were inadequate where the self-defense instruction failed to state that "the government had the burden of proof of disproving self-defense").

The Court agrees with the Idaho Court of Appeals that the jury instructions were not ambiguous, misleading, or confusing.  There is no reasonable likelihood that the jury applied the challenged instructions in a way that violates the Constitution.  *See Boyde v. California*, 494 U.S. at 380.  As a result, Petitioner has failed to show either deficient performance or prejudice related to appellate counsel's representation of him.  The decision of the Idaho Court of Appeals is not contrary to or an unreasonable application of the law, nor is it based on a unreasonable determination of the facts.  Habeas relief is not warranted under the circumstances.

## F.    Instructions for Appeal

Before a petitioner may appeal from the dismissal of a 28 U.S.C. § 2254 petition, he must first obtain a certificate of appealability by filing a request for a certificate of

**MEMORANDUM ORDER - 31**

appealability with the federal district court.  28 U.S.C. § 2253(c).  Until a certificate of appealability has been issued, an appellate court lacks jurisdiction to rule on the merits of an appeal.  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).   A federal district court will not issue a certificate of appealability absent "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  A petitioner satisfies this standard by demonstrating that reasonable jurists would find debatable both the merits of the constitutional claims and any dispositive procedural rulings by the district court.  *Miller-El v. Cockrell*, 537 at 336 (2003).

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED that Respondent's Motion for Summary Judgment (Docket No. 50) is GRANTED.  Petitioner's Petition is DISMISSED with prejudice.  Should the attorney general locate the original video tape showing the explanation of the Miranda rights and the signing of the waiver form within the next 60 days, the attorney general is ordered to lodge a copy with the Court and provide a copy to Petitioner, and the Court will reconsider that part of this decision after the parties submit any briefing they wish to file on that subject.

DATED:  **September 26, 2007**

Honorable Edward J. Lodge
U. S. District Judge

**MEMORANDUM ORDER - 32**